Number 18-2835,Scherer Design Group,LLC v. Ahead Engineering,LLC, et al. Messrs. Kistler and Coleman. Take your time setting up. Take your time. Take your time. Whenever you're ready. Good morning. May it please the court. David Kistler on behalf of the defendant slash appellants. Thank you for giving us the opportunity to argue this very important issue. You wish to return, reserve any time for rebuttal. I am reserving one minute for rebuttal. That's fine. So let me just go into some facts here. It looks so these fellows leave about last year around just about this time. Correct. And Gerstenfeld uses Hernandez's browsing history from his SDG,Scherer Design,computer to access information that's on there. Correct. He went on to the former employee's laptop computer that he used while employed at the company. And he knew he didn't have consent to do that. Correct. And he actively monitored the Facebook messages for about five weeks. Is that correct? Five to six weeks. Correct, Your Honor. And SDG has no policy that it might monitor activity on computers. Correct. I'll bet today it does, by the way. They do. After, so he went into a Facebook account, got information with respect to a bank account and got information with respect to a Dropbox. Correct. And this is all set forth in our expert report that we submitted to the district court. I'm not sure if I can opine on the order of what happened. But as we see it, he goes on the laptop computer. I think he's testified to this. He was clicking everything he could find on that computer, looking for anything he could find. He makes his way into the Facebook, the private and password protected Facebook messenger account. And he finds communications between and amongst the defendants as well as communications Mr. Hernandez was having with other individuals having no relation to this lawsuit. And he used a certain software that the person whose information he is seeking doesn't know that somebody else is intruding on that information. Is that correct? Correct, Your Honor. He installed and testified to installing software called FB Unseen, which is known as Facebook Unseen. And during his deposition, he testified that he did that so he could remain hidden on the Facebook messenger account while he was intercepting and downloading these communications. So from those facts, what gives SDG the right to do that? Nothing, Your Honor. We vigorously argued to the district court that the conduct that SDG engaged in after these individuals left the company amounted to unclean hands. And that those unclean hands should preclude the plaintiff from seeking or obtaining equitable relief in this case. But doesn't the case law say that even if there was illegality or impropriety, that alone is not sufficient to invoke the doctrine? And don't those who are seeking the doctrine, in this case the defendants, have to also show a relatedness between the alleged unclean behavior by plaintiff and plaintiff's cause of action, which is the breach of loyalty? Don't you have to show that relatedness? We do, Your Honor. And how do you show that here when the breach of loyalty, assumed for the purposes of discussion of the facts alleged are true by the plaintiffs, the breach of loyalty predated the eavesdropping into the Facebook account? How are they related? They're related, and I'd submit to the court, unless someone can find a case that no one in our case has, that this is an issue of first impression. I think there are some district court opinions that have had a circumstance sort of like this and said that the eavesdropping is not enough to show relatedness to the cause of action that that plaintiff was bringing. So there are some district court decisions on this. Not a lot, but a couple. What happened here, Your Honor, is they, as Judge Ambrose indicated, go on to the computer after these individuals left the company. They find past communications, that's true, that the complaint cites to and has screenshots of. But they didn't just stop at that. They also continued to look at communications that the individuals were having well after these communications, well after they left. We submit to the court, they did that because they were trying to find additional evidence to build their case. So what happened here is the core foundation of this case are those Facebook messages. I think any fair reading of the complaint is going to indicate that. The messages are screenshotted and are shown in isolation in the complaint. And that's the fundamental basis for this lawsuit and for the request for equitable relief. Those communications are what they're seeking equitable relief for. I understand that while they're seeking equitable relief, not for the communications, they're seeking equitable relief, as I understand it, from the defendants capitalizing on the client and intellectual property, that's their argument, of the plaintiff. That's what they're seeking, they want to stop that. Your point is proof of their breaches come from these driving. And proof that was sufficient were which led the district court to eventually enter temporary restraints and a preliminary injunction. But that didn't create, and again you know in the circuit the way that the relatedness inquiry has been articulated varies in lots of different ways. The district court opted for a narrow view reading. Certainly that was within the case law that existed. But one of the things that the privacy violation you're talking about, we're going to just shorthand it if you don't mind. They're hacking privacy violation, eavesdropping, same thing. For the purposes of discussion. None of that created some kind of right in the plaintiffs that they then sought to capitalize on. They had a pre-existing right to their own client list, their own intellectual property, and they had a right to expect their employees wouldn't use it for their own benefit. That had nothing to do with the subsequent eavesdropping. Correct? Correct. Well, Your Honor, I guess I would harken back to this court's decision in McMonigle where the court looked at the operation of the unclean hands defense in connection with a request for equity. And there what the court said was it's not about letting defendants off the hook. It's not about, you know, excusing them for their conduct. It's about the court's own integrity. That's what application of the unclean hands defense is about in this court. And isn't that a decision to be made by the court itself as to whether its integrity has been breached by the court's decision? Well, the district court didn't really provide any analysis as to the issue. The unclean hands defense got short shrift. You're using the unclean hands as a sword, which is a very unusual way to use the unclean hands doctrine. Well, being a doctrine that is generally used by the courts to preserve the integrity of the proceedings. And what I would submit to the court is whereas here you have evidence that was inappropriately obtained. That evidence was then used as the foundation for both the lawsuit and the request for equitable relief. And the court relied on that information in granting the injunction. The court's integrity is at issue, I believe. In its decision, do you think the court might have weighed the obtaining of information through the hacking of or going into the defendant's computer with the alleged theft of the intellectual property? I think the court might have weighed and balanced those two competing interests.  We don't know because the court really didn't provide any balancing test for its decision. The court what the court said was that there was a a disputed issue, a dispute of fact as to the circumstances under which Mr. Gerstenfeld obtained access to the to the Facebook messenger account. And then the court went on to provide the party's respective positions on the issues and concluded that the unclean hands were was arguably not related to the litigation. But later in the opinion, the district court does make an observation. And it says it makes an observation about one of the loss of net, a client loss of a client. Additionally, quote, the oft malicious and aggressive nature of defendants communications via Facebook messenger events and ill will toward plaintiff and plaintiff's business. Close quote. I'm looking at a 18 to 19. So it suggests along the lines of what just went is, I think, was asking is didn't we can read from the district court's opinion? It did do some kind of consideration sort of balancing using kind of your best nomenclature, the relative unkindness of the behavior. I think there are a couple of responses there. One, this was intended to be a threshold issue. The court purportedly decided it as a threshold issue. The language you're talking about, I don't have the opinion. It's after the court got through and rejected the unclean hands defense. And I don't want to get too far into the merits here. The extent of that issue was another very hotly debated issue before the district court in the context of likely of success, because it was our position. And we had deposition testimony from representatives of X to that that testified that they pulled the work from SDG, not because of anything untoward or improper that our clients did, but because they first offered the work to SDG and SDG refused it. That was in December of 2017. And they ultimately pulled the work from SDG because the work that SDG was doing for them was not up to the quality and standards that they demanded of their vendors. What happens if you prevail in this case and we determine that the unclean hands doctrine indeed applies in this case? Vacate the judgment of the district court? Correct. And that's a point I wanted to clarify. Plaintiff's papers seem to indicate that we're asking for what I would call a home run here. We're asking for the case to be somehow dismissed against us or anything like that. The case against you would not be dismissed. It would mean, as I understand it, that you can continue using the client list and you can continue mining the intellectual property that you have allegedly you have used. And we will presumably have a trial on the merits at some point. And if they're arguing that we did something improper with respect to any trade secret or client list or other information, they have a claim for damages. The case is moving forward. And I made the point about the dismissal because they have some, I think, some language in their opposition brief which seems to indicate that we're asking for more than what we're really asking for. We understand that what you're asking us to do is vacate the injunction. Correct. That's simply vacate the injunction. We move forward and there's a trial and the parties put on their respective cases. Rather than there occur further damages or substantial damages, what's wrong with the decision? Let's hold everything in place until we can get to the merits of this problem via a temporary restraining order. Well, that's where we've been for the past eight months in the case. And we're here today because we believe that the plaintiff's conduct doesn't justify an award of equitable relief under the circumstances. Let's go back to Judge Schwartz's question. The plaintiff's conduct, if you follow the New Valley case, has to be directly related to the case before the court. So there's a relatedness issue. If somebody is saying, alleging, that about a year ago there was a breach of loyalty and then subsequent to that, several weeks subsequent to that, there was, for lack of a better word, hacking into the account, how does the hacking into the account, whether it be bad or against the law or whatever, have anything to do relating to the breach of the duty of loyalty? Well, because if you're looking at the breach of duty of loyalty, in my view, you're looking at the merits of the preliminary injunction application. You're looking at the likelihood of success prong of the standard. Our position is you don't get there. You get to the unclean hands issue being a threshold issue. The court has to decide. And to your question, I'll repeat what I said earlier. It's our position that the factual basis for both the lawsuit and the request for injunctive relief were taken inappropriately through these Facebook messaging accounts. And that's why we're asking for the court to apply the unclean hands doctrine. So would your position be different if the district court didn't rely at all on the communications? The fact of the intrusion was, hypothetically, the fact of the intrusion is before the district court. The district court sees the complaint, says, you know, I'm not going to rely on any of those communications. I think there's sufficient evidence in front of me to issue the injunction. Would you be here on unclean hands? I think we still would be, Your Honor, because it's it's it's our view. And from experience you get firsthand, I can tell you that the information that set forth those text screenshots that are in the complaint, we believe, taped that the judge, whether or not she was going to rely on him or not, they were in the complaint. Is there authority that says we should, under my hypothetical, that we should not believe a district court judge when they say to us? No, these things that from February, mid-February to mid-March, I'm going to take them off the table. I'm not going to look at them at all and consider in considering what to do here. And I'm using my discretion in balancing the four factors here that I will enter a preliminary injunction. Are you saying you'd still be here? No, we wouldn't be here. Okay. I think that's the right answer. All right. Thank you. Let's hear from. Thank you, Mr. Coleman. And then we'll get you back to the final. Good morning, Ronald Coleman. for the plaintiff SDG or shared design group. Before saying anything, I must ask that the court allow me to correct the misapprehension. When you asked Judge Ambrose whether there had been sort of the miniature summary of the facts. There the Facebook messages were accessed. No bank account information was accessed. And no Dropbox information at Dropbox information was accessed through our forensic expert. It is true that our I.T. employee at the time clicked through everything in the browser history. So if it is called banking information to say he ascertained that someone had an account at such and such a bank, then that's banking information. But that would not be considered private information. Breaking was was was not breaking into the complaint. The source of the information that underlined the complaint that was filed. As it turned out, it was. It may very well be that if that had not happened. First of all, it was not broken into. It was a company owned computer company control computer. The I.T. director routinely went through other than the breaking into the computer, which shared design have learned of the. Well, it would have absolutely would have for two reasons. One is that it would have been impossible for it to realize that a substantial number of its clients have left for no obvious reason. And that the work, it's a small community, the world of the world of telecommunications towers, tower constructions. It would have come to the attention of our client that. But breaking into the computer was how your client learned of the. That's how they learned about it. So I feel property had been in the event. And that's why it saw a preliminary injunction. Would it have brought a lawsuit? And would it with this with these communications that have been produced in discovery? Yes. I think I'm following Judge Fuentes with a slightly different perspective. Was there anything that led SDG to believe that the employees who left were breaching their loyalty before you became privy to the Facebook messages? We obviously know from the recitation of the facts that Mr. partner didn't get a partnership, rejected a non-compete agreement. We know they about this extant that. Situation where they were going to do business, then ended up not doing business with SDG, ended up doing business with Mr. Schwartz and and one of the individuals who left before that individual left. That's what we know from the chronology predating. But the question I have is, I think, very similar to Judge Fuentes. Was there anything that would have caused SDG to suspect that there was going to be that, that there had been a breach of loyalty before seeing the Facebook communications? Yes, you're right. And can you tell me what some things they can share with us? Well, in addition to the departure of key clients, including Externet, which have been the most one of the most important clients during that period, counsel repeated a misstatement in the record or an assertion by the defendants, which has been proved to actually have been false, which is that as the extant that asked SDG to do work and SDG turned it down. And that's why the work walks. In fact, what the record subsequently showed was that the there was a confederate of the defendants who control some aspect of the and conspired to make a paper record on an electronic record that would give the impression of precisely that, that that that SDG turned down the work. And so what would have happened was that you get that information. I'm sorry. How did you get that information? From from e-mails that would produce a discovery. E-mails from e-mails between actually text messages, text messages between one of the defendants and the SD and the person that SDG, as well as text messages among the defendants that were produced in the regular course of discovery. Those were OK. So those. So the course of a nation that was Mr. Gerstenfeld got from Hernandez's Facebook account, how much of that was used in connection with the complaint that was filed on March 9? Absolutely. So how can you say that the it wasn't related to the duty of loyalty? That information that was found by the six weeks of five or six weeks of, for lack of a better word, hacking. It was related to the chronology of learning of the of the disloyal conduct, which is in and of itself a breach of trust. What was that conduct other than the loss of customers, other than loss of customers? And your honor is a little bit akin to other than that. This is Lincoln. How is the play loss of customers is the loss of the essence of a business. The accident in particular was the most important customer for SDG at that time. But what also became very apparent was that. A wealth of data and information that had been painstakingly assembled, collated, organized and stored by SDG was now in the hands of the defendants and that they were using it to build up their business. It's precisely to enhance one's own business that a company maintains that kind of information. How did you learn that they were in possession of a wealth of data? Mr. Gerstenfeld was able to determine using normal auditing tools and window that there had been extensive downloading by means of either uploading to cloud accounts or by by the attachment to the respective workstations of the departing employees before they left of portable media, which would allow them to download data and files, which would not be necessary in the normal course of their work because they had laptops. So there was no reason for them to download data. What they were doing, in fact, which was which this corroborated. This was an important point of the complaint. The audit trail that Mr. Gerstenfeld was able to establish using the normal window auditing tools corroborated what was being described and admitted to by the defendants in real time. But OK, so that gives us corroboration. But for the purposes of the unclean hands doctrine, in order for your adversary to invoke it, it has to demonstrate an immediate and necessary relationship between the challenged conduct and the claims for relief. So the challenge conduct here is the alleged hacking and the claims for relief you're making is the breach of loyalty. Is there an immediate and necessary relationship between the two, aside from that one corroborates your claim for relief? Is there any other relationship between them? We don't think we don't think there is. Your Honor, we can explain why. Because, again, as the court noted, the disloyal acts took place beforehand. It would be speculation for anyone to say whether a lawsuit would have eventually been brought or not. But at the end of the day, what defendants are saying is that this is not an attempt to transport the criminal doctrine of the fruit of the poison tree to a civil case. No, it's unclean hands. But I would ask the court to reflect on what exactly would be the distinction between them. Because, in fact, what we've heard is that the foundation of the lawsuit and the threshold issue was the information. In other words, if they didn't have this information, they never would have found us. And if they never would have found us, they wouldn't have had a lawsuit. That's the that's the fruit of the poison tree. And that does not apply in a civil case. This is discoverable information. And there may very well be a claim. In fact, there are counterclaims sounding in the alleged invasion of privacy that doesn't initiate the conduct that was enjoined. And it also doesn't in terms of the balancing. What does that mean? You acted deadly, but they acted worse than you did. That is a relevant consideration and equity. Judge Schwartz, in her colloquy with Mr. Kissler, did ask about that. It is a relevant consideration, even if the court were to find. And we believe that the district judge in balancing the facts that were before her and the standard for second guessing a district judge on a preliminary injunction, finding a fact is extremely high. We don't see how defendants have made it here at all. This was a company computer, wasn't it? Yes. And it was yours. Yes. And you have a right. I supposed to clean it, to go in and clean it out and perhaps pass it on to somebody else. Yes. But you use that computer to get into a Facebook account. Well, to get into if you turn on a computer on the Facebook. Is that where the line has to be drawn? I don't know. I our position is based on the on the cases with which we obviously with the client told us what conduct, you know, what what measures it had taken. This was after lawyers before lawyers got involved. It wasn't necessarily the way we might have advised them to do it. But having done it, we weren't able to find a case that said they couldn't do it for a case before you did it. I'm sorry. Did you look for a case before you did it? No, no, he didn't. He's not a lawyer. He's an engineer. You say you opened this account and it just sort of popped up. Well, then why did Mr. Gerstenfeld use nurse soft? The software program specifically designed to recover deleted browser history, deleted browser history. Well, why didn't just jump out at you? Well, once my understanding from Mr. Gerstenfeld's testimony is that there were two stages here. One was what I should back up a little bit on the chronology. The three three of the four defendants, individual defendants turned in their resignations approximately at the same day. And when they were asked to cooperate with transition, debriefing, handing over materials, they agreed. And then they subsequently retracted their agreement after a day in the office. This raised suspicions. Mr. Gerstenfeld was instructed by management. The record shows to see if there was anything on the computers that would indicate any misconduct. He then went to the browser history, the native browser history, not using any special software. That's when he discovered the Facebook messages. Only after that happened did he get the analytical tools to see what else he could learn. So there is a difference. You're right. But at some point he used nurse off to recover deleted Facebook messages. I'm not sure that that is. I think you I'm not sure that if you're if that's how you want to remember. Nurse off. That's its purpose. You're saying maybe that they dispute. They're saying that their soft was used to recover deleted messages. You're saying that the messages were not deleted. Yeah. Not only that. And it's in order to support my my my position on that. Your Honor, as Mr. Kistler pointed out, it was being monitored in real time afterward. In other words, the window remained open. They weren't. People don't usually delete messages in a social media chat box as they're going along. But what gives the point is, if if if I access today, you're if you have a Facebook account, if I access that. That's not right, is it? It might not be. But it might. But it might not rise to the level of unclean hands sufficient to overcome the record and the determination of the judge. In this case of the equities and based on the facts and based on the of the behavior complained of, which is absolutely a relevant consideration. Because, I mean, if you have a policy that says, OK, if you leave, we can go on to a condition of your employment. We can go on to your account and check what's there. But you didn't have that. Right. But but you're on to keep in mind that Mr. Hernandez's testimony was I deleted everything. The only way they could have gotten this was by using magic and using tools. If he didn't think if his expectation was not that information that he had left on the computer would be reviewed and that access that he had left available on the computer had been reviewed, he would not have to do what he says he did. The whole thing is to be pretty. I mean, we don't know what happened because it's in dispute as to whether he had deleted them or not deleted them. But you would think the usual human being would be pretty careful to delete. And in fact, his testimony was that he was that he deleted it, which means that his his expectation was. That if he didn't delete it, it would be read by SDG. So wouldn't it be better if if somehow that fact were determined at some point in connection with this? There's probably be more hearing for a permanent injunction. But shouldn't that fact be determined? Before the injunction analysis is done, it appears that the judge did not. That was the judge. Thompson did not find that the record was sufficiently well-developed, that the matter was in dispute. And I should point out she relied as I do in my brief. She relied extensively on non Facebook evidence in order to reach the conclusion that she did. So being experienced, a very experienced district judge and being very aware of the of what issues might come up on appeal, she had no difficulty finding in the record not only corroboration of the Facebook claims, but a wealth. When you filed the complaint, what were some of the. Items on the Facebook account of Mr. Hernandez that were included in the complaint that was filed on March 9th. Oh, a number of screenshots in which the conspirators discussed what files they would download, download from SDG and send to their new competing companies. Discussions of the glee with which they anticipated seeing SDG not only yield to them as competitors, but actually be destroyed and go out of business. Precisely the things that any advocate given such information would include in a complaint. And then you say that despite what was claimed here, that there was no looking at the bank account. They're all there. That's absolutely. There's nothing in the record to support the suggestion. What was the basis for the claim that there was that they had looked into his account? That Mr. Gerstenfeld clicked through every place that had been visited that was found in the browser history. So we got to a he got to a banking account, got there. No passwords. Did he try to click and see if you could open it? He did. Did he open it? No. Unclean hands certainly doesn't arise at a level of what you wish you could do. Well, nothing relating to that account. Nothing related to the account was revealed. Primarily it's the Facebook messages. I will. Since your honor, I've asked about the bank account. There was testimony that the concern that the reason the account was considered to be something not merely snooping, was that once the once it became evident that. There was this aspect of disloyalty and information, data, client files, client contacts were being transferred. There was concern that perhaps payments were also being transferred because, you know, the court has asked several times about policies being in place, policies not being in place. It is true that the fundamental failure here is of our client to have trusted the defendants. So payments were being transferred. You say there there was some concern in the moment of panic. When when SDG suddenly realized that clients were in danger of being of having left. And Mr. Gerstenfeld did the windows audit and saw that there had been extensive downloading that perhaps perhaps there had been money transferred. He clicked on the bank account page. The banks have much higher security than Facebook. Facebook is actually notoriously hard to log out of. And therefore, nothing happened. None of that information relating to the bank account was was used in connection with the complaint. There was no information. Thank you very much. Be brief and I can start where you ended. I don't think it's a huge issue. But the reason we allege that the bank accounts were at least attempted to be accessed is because that's what our forensic computer expert found when he had the mirror image of the hard drive of the laptop. And that's at a two forty three, the appendix where you could see multiple instances of Mr. Gerstenfeld attempting to access the same Bank of America bank account as well as a Yahoo as well as well as a Yahoo account here. And it even says that the that there was an error in the try again in the in the narrative as to what was happening with the access to that. So I think what Mr. Coleman is saying is that he tried, but nothing was fruitful that he found. Correct. We're not we're not alleging that anything from the bank accounts was used in the lawsuit, but it's it's really a side point. What I'd like to conclude with is the precedent the court is being asked to consider here and weigh in on is whether a employer can impermissibly access a former employees company laptop. There's nothing wrong with that, is there? Well, well, let's let's see. My email is read all the time by the court's office. It all it all goes back to standard because we consent since 2001. Do we really need to make that broad pronouncement here? Do we have to adopt that when it doesn't? Whether assuming you're correct that there's a protectable privacy interest, that in and of itself isn't enough to gain relief. So this court doesn't need to really opine that implicate that issue. We don't have to weigh in just like the district didn't really have to weigh in. But what happened here is it went well beyond that, and they continued to monitor and to intercept communications to build a factual foundation for a lawsuit and for request for equitable relief based upon those intercepted communications. It's not a clean hands. It's really a judicial doctrine, isn't it? I mean, it's for the court to ensure and preserve the integrity of proceedings in the court. And it seems to me it would be a high bar to scale to now tell Judge Thompson you you abuse your discretion, even though what the judge is trying to do, of course, is to preserve the status quo and not use the unclean hands doctrine. Because that she apparently determined that the proceedings could could play out and she could make a proper decision without dismissing the case. She did. And we respectfully disagree with that. And our position is that this court and the district court's integrity is in the case. I'm sorry. Without issuing a dissolving the temporary restraint and entering a preliminary junction. Yes, it's our position that the courts, this court and the district court's integrity is absolutely at play. When the circumstances presented here were that they used the intercepted communications to as the basis for the lawsuit and request for equitable relief. I mean, this type of situation happens throughout America almost every business day or maybe even non-business days. Employees leave. They do their relationship with Company X, their employer. They know about good customers and they go out and they try to gain those customers for themselves when they start up their own entity, entity Y. If that happens, I'm not saying who's right or wrong here, but if that happens, then you've got a problem for bad conduct on behalf of the employees who left. Again, I'm not applying it to this case. The employer has bad conduct, let's say, in without consent looking into an account. What stops a district judge from saying, you know what, until I resolve this finally with regard to a permanent injunction hearing, I'm just going to preserve the status quo. Nothing prevents a district court from doing that, Your Honor. That's what happened here. But you say it was an abuse of discretion? Yes. Because? Because the lawsuit is predicated on illegally hacked information that the plaintiff got through improper means. But they're also saying that there were a lot of examples of bad conduct by Messrs. Hernandez et al. I understand that and that could be litigated through the usual course of a lawsuit without the need for injunctive relief being issued. What if they had just information other than the Facebook account? That's all they knew at the time they filed suit, and thereafter they serve a document demand, produce all your Facebook pages. None of this is protected. It's getting disclosed. And at that moment, they come in and seek relief. So it's the same evidence. But they didn't have unclean hands in obtaining the information. So it's the method by which the material was obtained which is troubling you most of all. Absolutely. Thank you. Thank you very much. Thank you. I would ask both counsel if you would get together with the clerk's office afterwards and have a transcript of this oral argument and split the cost. Thank you. Thank you both for presenting arguments.